630 F.Supp. 171 (1986)
FIRST WISCONSIN NATIONAL BANK OF MILWAUKEE, a national banking association, Plaintiff,
v.
TOWBOAT PARTNERS, LTD., a Missouri limited partnership, et al., Defendants.
No. 84-2285C(B).
United States District Court, E.D. Missouri, E.D.
February 21, 1986.
John Dawson, Foley & Lardner, Milwaukee, Wis., James O'Brien, St. Louis, Mo., for plaintiff.
Edwin Akers, Jr., Gallop, Johnson & Neuman, St. Louis, Mo., for defendants.

MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
In this action by First Wisconsin National Bank of Milwaukee (First Wisconsin) against Towboat Partners, Ltd. (Towboat Partners) and all its general and limited partners, and two guarantors to recover on two promissory notes and an unconditional continuing guarantee thereof executed by G.W. Gladders Towing Company, Inc. and G.F. Investment Corporation, the only contested issues relate to the cross-claim and third-party complaint of the limited partners of Towboat Partners against the general partners and guarantors.
Towboat Partners is a Missouri limited partnership with three general partners, Donelan Phelps & Company (Donelan Phelps), Gladders Barge Line, Inc. (Gladders) and Frontier Boats, Inc. (Frontier). Donelan Phelps is a Missouri general partnership, the partners of which are Patrick Donelan and Thomas Phelps. Towboat Partners was organized as a tax sheltered *172 investment opportunity for the limited partners for the purpose of operating a barge tow (the M/V Ann Gladders) out of St. Louis. Each limited partner is the owner of two or more limited partnership units.
To finance the purchase of the tow, Towboat Partners borrowed $3,350,000 from First Wisconsin, evidenced by a promissory note executed as of October 15, 1982, by the general partners and by all the limited partners. Under the terms of the note (which was also secured by the vessel itself), Towboat Partners and each of the general partners are jointly and severally liable for the full amount due thereunder including interest, attorneys' fees and other expenses of collection. Each limited partner is also liable to the extent of the lesser of $47,378.50 per partnership unit owned by said partner or his pro rata share (based on the number of units owned) of the outstanding principal balance and accrued interest.
By reason of Towboat Partners' default in making payments due, First Wisconsin accelerated the maturity of this note (the "Ship Mortgage Note") which is the subject of First Wisconsin's first cause of action. Subsequent to the default, the boat was seized in an admiralty proceeding filed by another creditor of Towboat Partners in the Southern District of Illinois. First Wisconsin intervened in that proceeding to protect its security interest. Ultimately, the boat was sold at public auction by the United States Marshall and the sale was confirmed by the Court for the total sum of $900,000, of which First Wisconsin received $855,377.90, which it applied to reduce the balance due on the Ship's Mortgage Note.
During the course of the present lawsuit, separate settlements were negotiated with each of the limited partners, whereby they paid First Wisconsin, in the aggregate, the sum of $2,733,103.73, following which they were dismissed as parties defendant, the right of action against the general partners and Towboat Partners for the balance due being expressly reserved by First Wisconsin. The payments by the limited partners included attorneys' fees and expenses incurred by First Wisconsin in the aggregate amount of $57,944.
First Wisconsin's second cause of action is based upon another promissory note (the "Revolving Credit Note") dated December 9, 1980 in the principal sum of $250,000, which with interest, was payable on demand. This note was executed only by Towboat Partners and the three general partners to evidence money loaned to Towboat Partners. The entire principal of this note together with interest, attorneys' fees and other costs of collection is still unpaid. Recovery against the guarantors on both notes for the amounts payable thereunder is based on the written agreement of said defendants guaranteeing payment when due of all obligations of Towboat Partners for money owing to First Wisconsin.
It is clear from the admitted and uncontested facts that neither the general partners nor the guarantors have any defense (and they offered none) to either the first or second causes of action, and that First Wisconsin is entitled to judgment thereon for the amounts remaining due after crediting the Ship Mortgage Note with the payments made by the limited partners.
As of September 3, 1985, the date First Wisconsin's claims were tried, there was a principal balance still owing on the Ship Mortgage Note (Count I) of $7,997.32 together with unpaid interest in the amount of $4,906.06. Daily interest of $2.25 has continued to accrue on the principal balance. The amount then owed on the Revolving Credit Note (Count II) was the principal ($250,000) and interest of $53,554.03. Daily Interest at $72.96 continues to accrue on the principal. The aggregate amount owing by defendants on the two notes as of the date of trial was $316,437.41, consisting of $257,977.32 principal, and $58,460.09 interest. In addition, attorneys' fees and other expenses incurred as collection costs not reimbursed by the limited partners aggregated a total of $25,310.39 on the two notes. Thus, the total amount remaining due on the two notes to First Wisconsin as of September 3, 1985 by the general partners and guarantors, jointly *173 and severally, was $341,747.80. In addition, First Wisconsin is entitled to daily additional interest at the rate of $75.14 on the aggregate principal balance of $257,977.32.
We now address the cross-claim and third-party claim of the limited partners and the defense thereto presented by Donelan Phelps and its partners.[1]
Section 8(e) of the Limited Partnership Agreements specifically requires the general partners, jointly and severally, to contribute in cash, on a monthly basis, as additional capital contributions any amounts necessary to meet and fully fund deficiencies in the minimum cash flow requirements of the partnership. Since at least December, 1983, and continuously thereafter, the gross revenues of the partnerships were insufficient to meet and fund the minimum cash flow requirements and the general partners and each of them (including Thomas Phelps and Patrick Donelan) have failed and refused to advance and pay any amounts so agreed to be paid. Under the Agreements, by reason of such failure, the General Partners are liable for all attorneys' fees and other costs of collection incurred by the Limited Partners in enforcing such payments together with interest from the date the capital contribution was due.
Section 8(e) further provides that if, prior to October 15, 1989, a default occurs on the Mortgage Note which is attributable in whole or in part to the failure of the General Partners to promptly contribute when due their additional capital contributions, the general partners shall jointly and severally indemnify the Partnership and each limited partner from all loss, damage, cost or expenses incurred as a result of any such default, "including specifically the loss of any tax benefits." Paragraph 9(e) has a comparable indemnity provision.
The default of the general partners in making the monthly payments resulted in the instant litigation and caused the limited partners to incur substantial losses and expenses, for which the cross-claim seeks indemnity from the general partners and (by the third-party petition) from Thomas Phelps and Patrick Donelan, the partners of Donelan Phelps.
At the conclusion of the evidence in chief presented by the limited partners, the Court sustained their motion for a directed verdict against the guarantors, G.W. Gladders and G & F Investment, neither of which appeared at the trial. The Court also sustained the motion of the limited partners for a directed verdict against two of the general partners, Gladders and Frontier, who did not appear or present evidence. The Court took with the case the limited partners' motion for a directed verdict against Donelan Phelps and its two partners, who presented evidence in support of their defense.
As indicated supra, the operative facts which give rise to the liability of Donelan Phelps and its two partners (absent proof of the affirmative defense) have not been controverted and need not be repeated. The defense, as pleaded, is that defendant Donelan Phelps "was effectively and constructively removed as the general partner of Towboat Partners by some or all of the Limited Partners as agents and attorneys so that some or all of the Limited Partners became responsible as general partners for the management of Towboat Partners and defendant Donelan Phelps & Company was prevented from carrying out its duties and responsibilities as general partner or from conducting the affairs of the partnership as required in the partnership agreement. As a result this defendant ceased to be liable or responsible as a general partner of the partnership and was prevented from carrying out its duties and responsibilities by virtue of direct dealings between plaintiff *174 and the Limited Partners." In our judgment, the affirmative defense is lacking in merit and unsupported by any credible evidence.
As the partnership was set up and conceived, Gladders had the responsibility for operating, crewing and provisioning the vessel, Frontier had the responsibility for getting business (that is obtaining barges for the vessel to tow), while Donelan Phelps had the primary responsibility for overseeing the operating of the vessel, and the reporting function and the sending of reports to the limited partners. The limited partners had nothing to do with the day to day activities of the partnership.
Unfortunately, the rosy predictions and forecasts of profitability did not materialize, with the result that by the summer of 1983, it was obvious (at least to the general partners) that the vessel would not generate revenue sufficient to cover operating expenses and debt service to First Wisconsin. During the summer and fall of 1983, the general partners continued to make contributions of capital for debt service payments, although some payments were not timely. Finally, however, the point was reached where the losses were so great that the general partners, in violation of their partnership agreements, concluded that they either would not or could not make any further capital contributions, and Donelan Phelps (through Mark A. Lincoln) entered into discussions with F.R. Dengel, the loan officer of First Wisconsin, as to the means of solving their dilemma.
At the urging of Dengel, Lincoln communicated with the limited partners, in particular A. John Robertson, for the purpose of obtaining additional financial support from the limiteds. With the aid and advice of Dengel, pressure was continually put upon the limiteds to effect such purpose. Lincoln painted a rosy picture of an economic recovery within a year in the river industry. Finally, upon the representation of Lincoln that such new funds would be for debt service only and not for general operating needs, a "Restructuring Agreement" was drafted. During the course of their discussions, Robertson made it clear that any agreement would be a "one-time only agreement" which would in no way relieve the general partners from their "ongoing obligations" as set forth in the existing partnership agreement.
The "Restructuring Agreement" recites, inter alia, that the obligation to make additional necessary capital contributions is that of the general partners and that the limited partners have no obligation to make further contributions of capital or to lend any funds to Towboat Partners. It further recites the failure of the vessel to generate sufficient operating income to cover debt service since late 1982 or to meet its total cash needs, that the general partners "expect" to obtain the commitment of First Wisconsin to extend a line of credit to the partnership in an amount not to exceed $700,000 "but only on the terms [thereafter] described", and that "the General Partners believe that obtaining such a line of credit and taking the actions described [therein] are the only reasonable courses of action that will increase the opportunity of [Towboat Partners] to realize its long-term purposes and the intended benefits to the Limited Partners."
Essentially, the Agreement provides that the limited partners consent to the partnership obtaining a line of credit from First Wisconsin, not to exceed $700,000, the draws on which could be made only with the prior written consent of Gerald J. Schmitt, the Third Party Designee, it being understood by all the parties that the line of credit would not be granted unless secured by a guarantee of the limited partners. Other provisions (to which only the general partners were parties) related to changes in the rights and obligations of Trimar Associates, which was managing and operating the vessel under a management agreement with the general partners.
The Agreement also contains the following specific provision:
"10. No Waiver.

By execution hereof the Limited Partners are not waiving any right or remedy they may have against any one or more *175 of the General Partners by reason of the failure of the General Partners to comply with their past or future obligations to make additional contributions as set forth in Paragraph 8(e) of the Partnership Agreement, including without limitation any failure by the General Partners to make such additional contributions to fund Minimum Cash Flow Requirements which are instead funded by draws against the Line of Credit."
The Restructuring Agreement was ultimately signed by all but one of the limited partners, the last to sign being Robertson, who affixed his signature on May 31, 1984. As of that time, but unknown to Robertson (the only local limited partner), the boat had been seized by the United States Marshall at the instance of trade creditors who claimed liens in the approximate amount of $200,000. We credit Robertson's testimony that he would not have signed the Agreement had he been aware of the seizure. Subsequently, other lien claims were filed. In June, 1984, Lincoln sent Robertson a note enclosing a June 7, 1984 letter signed by the general partners and addressed to First Wisconsin which requested an initial draw of $178,000 on the line of credit, to be forwarded by him to Schmidt for signature as Third Party Designee. In the next several days, Lincoln also informed Robertson that Gladders had gone out of business, in addition to imparting other unfavorable information.
It had become apparent that the new money for the repayment of which the limited partners would become liable was now intended by Lincoln and First Wisconsin to be used within a very short period not only to bring the mortgage note current but to pay all of the approximately $400,000 owing to creditors, with the result that very little would be left to attempt the apparently hopeless task of keeping the partnership afloat. Robertson decided that it would be inadvisable to consent to Lincoln's request, and so he did not submit it to Schmidt for approval. There was, however, nothing to prevent Lincoln from directly submitting the request for the draw to Schmidt, but he did not do so.
On the basis of the foregoing, Donelan Phelps now contends that they were "effectively" removed as general partner, with the result that the limited partners for all practical purposes became responsible to the same extent as general partners. This contention is completely lacking in merit. It was advanced for the first time in the pleading filed on their behalf in defense of the cross-claim. Prior thereto, neither Donelan Phelps nor any other general partner even intimated (much less notified the limited partners) that it considered it had been "removed" as a general partner. Instead, they continued to act as such.
In addition, neither Robertson nor any other limited partner at any time exercised any control over the day to day operations of the partnership. Nothing they did prevented Donelan Phelps nor any other general partner from complying with their obligations as general partners. The only "control", if what Robertson did could possibly be considered such, was over the expenditure of what were in effect the limited partners own funds. As we have noted, the Restructuring Agreement (assuming it became effective) provided for a $700,000 gamble by the limited partners without being given anything in return by Donelan Phelps if the gamble proved unsuccessful. Undoubtedly, it would not have been executed had it not been the pressure put upon Robertson by both Lincoln and First Wisconsin and had he been fully informed of all pertinent facts such as the seizure of the vessel. And in any event, as of June 7, 1984, when the request for the draw was made, it was crystal clear that the expenditure of the moneys of the limited partners would merely have postponed the inevitable and resulted in a greater loss to the limiteds.
Over and beyond the foregoing, not only was Donelan Phelps fully apprised that the limited partners did not intend to take any action which would change the relationship between the limited and the general partners, but the Restructuring Agreement itself (in Paragraph 10) emphasizes the *176 understanding that the liability of Donelan Phelps for its past and future breaches of the partnership agreement was to be in no way affected thereby.
Section 359.070 RSMo. of the Limited Partnerships Act provides that a limited partner shall not become liable as a general partner unless "he takes part in the control of the business." Under the evidence, we hold that neither Robertson nor any other of the limited partners took part in the "control of the business", certainly not within the intent and purpose of the Missouri Act which governs the partnership agreement. Donelan Phelps has failed to prove its affirmative defense, so that the limited partners (cross-claimants) are entitled to judgment on their cross-claim and third-party petition against Donelan Phelps and its partners, Thomas Phelps and Patrick Donelan, for the losses and expenses attributable to the failure of the general partners to make their required contributions. Included in such losses, in addition to the aggregate amount paid by them to First Wisconsin ($2,733,103.73), are attorneys' fees of $40,000 and the Investment Tax Credit in the amount of $191,409 they lost when the vessel was taken out of service by the judicial sale thereof. As noted supra, Paragraph 8(e) of the Partnership Agreement provides that the general partners indemnify the limited partners for all loss, damage, cost or expenses incurred in whole or in part as a result of the failure of the general partners to make their agreed contributions, "including specifically the loss of any tax benefits."
The foregoing Memorandum Opinion and Order constitutes our findings of fact and conclusions of law. Judgment will be entered in accordance herewith.

JUDGMENT
The Court having this day entered its Memorandum Opinion and Order, and being fully advised in the premises,
NOW THEREFORE, in accordance with said Memorandum Opinion and Order, IT IS HEREBY ORDERED and ADJUDGED
1. Plaintiff First Wisconsin National Bank of Milwaukee shall have and recover of and from defendants Towboat Partners, Ltd., Gladders Barge Line, Inc., Frontier Boats, Inc., Donelan, Phelps & Company, G.W. Gladders Towing Company, Inc., and G.F. Investment Corporation, jointly and severally, in the amount of $341,747.80 with daily interest on the sum of $257,977.32 at the rate of $75.14 from September 3, 1985 to the date of this judgment, and interest on the entire amount of this judgment computed according to the rate and method set forth in 28 U.S.C. § 1961, together with costs.
2. Cross-claimants and third-party plaintiffs, Joseph E. and Marlys J. Heintz, N. John Schaedler, Raymond T. Olsen, John A. Wander, Robert Ball, Wayne I. Chertow, Anthony M. Mandolini, William B. Mitchell, Dennis P. Van Mieghem, Thomas E. Vincus, George Drakey, John E. Easton, Paul K. Richey, The A. John Robertson, Jr., Revocable Trust, a Missouri trust, Ronald L. Varley, Peter Elder, S.F. Associates, a New York partnership, Neil Glenn, Thomas Holton, Len-How Associates, a New York partnership, Robert G. McGregor, Dudley C. Mecum, II, Donald R. Sloan, Galaxy Partners, a New Jersey partnership, and William Simon, shall have and recover of and from cross-defendants Donelan Phelps & Co., Thomas Phelps, Patrick Donelan, Frontier Boats, Inc., Gladders Barge Line, Inc., G.W. Gladders Towing Company, Inc., and G-F Investment Corporation, jointly and severally, in the amount of $2,964,512.73 together with interest thereon computed according to the rate and method set forth in 28 U.S.C. § 1961, and costs.
NOTES
[1] Under Missouri law, a general partnership cannot be sued as such, so that any claim against the partnership must be brought against the individual partners. By the third-party petition, Thomas Phelps and Patrick Donelan, the partners comprising Donelan Phelps, were made parties to the cross-claim in order to obtain a personal judgment binding on them based on their partnerships obligations. Herein, we will treat them as defendants to the cross-claim.