**In re ASTROLINE COMMUNICATIONS COMPANY LIMITED PARTNERSHIP, Debtor.**

**Martin W. HOFFMAN, Trustee, Plaintiff,**

v.

**WHCT MANAGEMENT, INC.; Thomas A. Hart, Jr.; Astroline Company; Astroline Company, Inc.; Herbert A. Sostek; Fred J. Boling, Jr.; Richard H. Gibbs; Randall L. Gibbs; Carolyn H. Gibbs, Richard Goldstein, Edward A. Saxe and Alan Tobin, as Co–Executors of the Estate of Joel A. Gibbs; Defendants.**

Bankruptcy No. 88–21124.
Adv. No. 93–2220.

United States Bankruptcy Court,
D. Connecticut.

Oct. 24, 1995.

John B. Nolan and Steven M. Greenspan, Day, Berry & Howard, Hartford, CT, for Trustee–Plaintiff.

Ben M. Krowicki, Bingham, Dana & Gould, Hartford, CT, for Carolyn H. Gibbs, Richard Goldstein, Edward A. Saxe and Alan Tobin, As Co–Executors of the Estate of Joel A. Gibbs, Defendants.

Michael J. Durrschmidt, Hirsch & Westheimer, P.C., Houston, TX, for Randall L. Gibbs, Defendant.

Robert A. Izard, Jr. and Louise Van Dyck, Robinson & Cole, Hartford, CT, for Astroline Company, Astroline Company, Inc., Herbert A. Sostek, Fred J. Boling, Jr. and Richard H. Gibbs, Defendants.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Chief Judge.

## I.

### ISSUE

The central issue in this proceeding, to which the parties devoted nine trial days, is

whether the defendant, Astroline Company (and its general partners), a limited partner of Astroline Communications Company Limited Partnership (the "Debtor"), are liable as a general partner for the Debtor's prepetition obligations for having participated in the control of the Debtor's business substantially the same as in the exercise of the powers of a general partner. The plaintiff, Martin W. Hoffman, the Chapter 7 Trustee (the "Trustee") of the Debtor, bases his claim upon 11 U.S.C. § 723(a).[1] The defendants, in addition to denying any liability, challenge the standing of the Trustee to assert claims against them.

## II.

### BACKGROUND

#### A.

On October 31, 1988, creditors filed an involuntary petition against the Debtor, a Massachusetts limited partnership. The Debtor consented to an order for relief and the court, at the Debtor's request, converted the case to one under Chapter 11. The court, on April 9, 1991, reconverted the case to one under Chapter 7 upon motion of the creditors' committee. On March 17, 1994, the court granted the Trustee's motion to file an amended complaint which asserts, in material part, the liability of the defendants to satisfy the deficiency in the estate's property to pay in full the Debtor's creditors.[2]

#### B.

In April 1984, the license of Faith Center, Inc. ("FCI") to operate a television station known as WHCT–TV Channel 18 ("Channel 18") in Hartford, Connecticut was subject to a license-revocation hearing before the Federal Communications Commission ("FCC"). Thomas A. Hart, Jr. ("Hart"), a Washington,

D.C. attorney, contacted one of his clients, Astroline Company and informed Fred J. Boling ("Boling"), an Astroline Company general partner, that Channel 18 could be purchased under the FCC minority distress sale policy.

Astroline Company, a limited partnership, organized · in 1981 under the laws of the Commonwealth of Massachusetts, had been formed for the purpose of making investments in a broad array of businesses and industries. Astroline Company originally included four general partners—Boling, Herbert A. Sostek ("Sostek"), Richard H. Gibbs and Joel A. Gibbs. At a later date, Randall L. Gibbs became a general partner.

Hart advised Astroline Company that to purchase the Channel 18 license, the purchasing entity would need a partner who was a qualified minority applicant under the FCC guidelines. On or around May 26–28, 1984, Hart introduced to Astroline Company, Richard P. Ramirez ("Ramirez"), who could qualify for the purchasing entity as a Hispanic minority applicant. After a two-hour meeting, Ramirez, whose prior experience had been primarily in radio, was offered a position as general partner in an entity to be organized.

On May 29, 1984, Astroline Company organized the Debtor as a Massachusetts limited partnership with Ramirez as a general partner. On the same day, the Debtor signed a Purchase and Sale Agreement with FCI for the purchase of Channel 18. In addition, on the same day, Astroline Company organized WHCT Management, Inc. ("WHCT Management") as a corporation to be a second and corporate general partner of the Debtor. Astroline Company formed WHCT Management to allow for the survival of the Debtor in the event of the incapacity or death of Ramirez, and to sign checks through its offi-

---

1. Section 723(a) provides:

   (a) If there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner to the extent that under applicable nonbankruptcy law such general partner is personally liable for such deficiency.

11 U.S.C. § 723(a).

2. The amended complaint included certain additional parties and other causes of action that have since been dropped or otherwise disposed of. The parties agreed to bifurcate the proceeding so that the present matter includes the issue of liability only. If liability is found to exist, the parties intended a subsequent hearing to establish the amount of the recovery.

cers when Ramirez was not available. Under the limited partnership agreement, Ramirez had operational control of the Debtor and voting control as a general partner by virtue of his majority control of the general partnership interest. Astroline Company owned 100 percent of the WHCT Management stock until February 1986, when Astroline Company transferred the shares of stock to Boling, Sostek and the three Gibbs'.

At the Debtor's inception, Ramirez held a 21 percent ownership interest, WHCT Management, a 9 percent ownership interest, and Astroline Company, a 70 percent ownership interest in the Debtor. The purchase price for Channel 18 was $3,100,000 with $500,000 paid in cash and a promissory note given for $2,600,000. The closing for the station took place in January 1985, at which time Astroline Company made its initial $500,000 investment in the Debtor.

None of the Astroline Company partners had any experience in the television station business, and Astroline Company had no employees. Boling and Sostek were the managers of the Astroline Company investments. Ramirez developed a business and operating plan for Channel 18, hired Terry Planell ("Planell"), a native of Cuba and a person experienced in television programming, to be station manager, and Alfred Rozanski ("Rozanski") to be the Debtor's business manager. While Ramirez and Rozanski met with Boling on occasion to explain the Debtor's annual budget, throughout the 1985–1988 time period when Channel 18 was operating, Ramirez and Planell, together or separately, handled the matters of the hiring and firing of station personnel, station programming, equipment purchases, and dealing with the Debtor's vendors. Ramirez kept Boling or Sostek informed of these business decisions and consulted with them before making decisions on improvements to the Debtor's physical plant.

Prior to the creation of the Debtor, the single largest investment made by Astroline Company in any one business was $1 million. The Astroline Company partners initially had no expectation that Astroline Company's investment in the Debtor would exceed that amount. They anticipated that all additional funds needed to operate Channel 18 would be secured from third parties and that such funds might reach $15 million. When the Debtor was unsuccessful in obtaining outside funding, Astroline Company chose to fund the Debtor's operational and capital needs itself. Boling advised Ramirez that Astroline Company's investment would not exceed $20 million. In 1985, the Debtor sustained a loss of almost $5 million, and in 1986, a loss exceeding $8 million. Arthur Andersen—a national accounting firm—audited the Debtor's books. By spring 1987, Astroline Company had invested $22 million in equity and the Debtor's annual payroll was about $1,250,000. All funds advanced to the Debtor by Astroline Company thereafter were in the form of loans. By early 1988, the Debtor was in serious financial distress.

### C.

At the heart of the controversy between the parties is the conclusion to be drawn from the cash management system (the "Cash Management System" or "System") instituted at the Debtor's place of operation in Hartford to deal with the Debtor's accounts payable and receivable. Ramirez and Astroline Company originated the System at the start of the Debtor's operation before the Debtor had sufficient office personnel in Hartford. Thereafter, the System was continued at the request of Astroline Company and with the concurrence of Ramirez. The System covered all receipts and disbursements of the Debtor from its inception until August 31, 1988, when Astroline Company decided to stop furnishing monies to the Debtor.

All operating revenues received by the Debtor were deposited in a lock box account at the Bank of Boston Connecticut office in Hartford. These funds were then swept twice weekly and transferred to a bank account at State Street Bank in Boston, Massachusetts. Astroline Company partners obtained lines of credit at State Street Bank which they used to fund any shortfall in the Debtor's account at the State Street Bank. Funds were automatically drawn down on the lines of credit and deposited into the State Street Bank account when necessary to

cover any deficits. Ramirez, Boling, Sostek, Richard H. Gibbs and Joel A. Gibbs each had authority to sign checks drawn on the Debtor's bank account at the State Street Bank.

Until just prior to the bankruptcy filing, there was no checkbook in the Debtor's office in Hartford for the Debtor's State Street Bank account, and the Debtor maintained no other checking accounts. In order for the Debtor to pay an invoice, after the Debtor's department head which incurred the liability approved payment and the Debtor's accounting department had encoded the obligation, the Debtor sent the invoice to the Astroline Company office in Saugus or Reading, Massachusetts. Persons employed by Astroline Corporation, one of the entities owned by Astroline Company, generated a check in payment of the invoice. The check, and the original documentation sent to Astroline Company, would then be returned to the Debtor where, in almost all instances, the check would be signed by Ramirez and sent to the creditor. Prior to August 31, 1988, Astroline Company processed all of the Debtor's checks, which numbered in the thousands, in this manner. The State Street Bank sent the Debtor's bank account statements to Astroline Company offices in Massachusetts.

On two occasions during 1985, Astroline Company caused checks of the Debtor to be drawn to the order of Astroline Company for "interest"—one in the amount of $5,352, and the other for $20,071. Boling signed the first check, and Joel Gibbs the second. Ramirez, at trial, had no recollection of his involvement with the issuance of these checks. Partners of Astroline Company, except for Randall Gibbs, generally signed checks when Ramirez was unavailable or when he was the payee. Beginning in 1988, Boling started writing "O.K." or "O.K. FJB" on invoices to indicate to Astroline Corporation employees that funds should be advanced by Astroline Company to the Debtor's account to cover the checks.

On September 1, 1988, after deciding to stop advancing funds to the Debtor, Astroline Company returned the checkbook to the Debtor, and a checking account for the Debtor was opened in Hartford. Creditors filed the involuntary bankruptcy petition on October 31, 1988. On November 2, 1988, Astroline Company was dissolved and all of its assets transferred to Astroline Company, Inc., a Massachusetts corporation of which Sostek, Boling, Richard H. Gibbs and Randall L. Gibbs were the officers, directors and shareholders. At the same time, the Astroline Company partners transferred their shares in WHCT Management to Ramirez for no consideration.

## III.

### DISCUSSION

#### A.

■ The defendants, in their post-trial memoranda, raise the issue of whether the Trustee has standing to assert claims under § 723(a). They contend that § 723(a) does not include a cause of action by a Chapter 7 trustee to pursue a limited partner on the ground that the limited partner acted as a general partner, because such actions may be maintained only by creditors of the Debtor. See Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 429, 92 S.Ct. 1678, 1685, 32 L.Ed.2d 195 (1972); Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir.1991). They assert the plain language of § 723(a) refers to a claim against a "general partner" only.

■ This challenge to standing was implicated in two prior rulings of the court. After the Trustee brought his original complaint, the parties argued to the court the issue of whether the proceeding was core or noncore. In Hoffman v. Ramirez (In re Astroline Communications Company Limited Partnership), 161 B.R. 874 (Bankr.D.Conn.1993), the court ruled that the counts in the complaint "constitute core proceedings because they involve causes of action created and determined by a statutory provision of title 11." Id. at 880. The court noted that under § 541(a)(3), property of the estate includes property the trustee recovers under § 723(a), and that a trustee may utilize § 723(a) to hold limited partners who act as general partners liable to the estate to satisfy any deficiency. Id. at 879. This is so notwith-

standing that the question of whether a limited partner is personally liable on a claim is determined, not by the Bankruptcy Code, but by relevant state partnership law. *See Marshack v. Mesa Valley Farms L.P. (In re Ridge II),* 158 B.R. 1016 (Bankr.C.D.Cal. 1993).

In an oral ruling rendered on October 12, 1994 on the defendants' motion for summary judgment, the court again addressed the standing issue, and, relying on the authorities cited in its ruling on the core issue, held that the Trustee had standing. Certain defendants argue that the court, having now heard the evidence introduced at trial, should reconsider the matter of standing. They cite *Thompson v. County of Franklin,* 15 F.3d 245, 249 (2d Cir.1994) (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), for the proposition that the court must continuously consider "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Defendants' Post–Trial Memorandum at 3. The court discerns no reason to depart from its prior holdings and reaffirms that § 723(a) includes a cause of action by a Chapter 7 trustee to pursue limited partners on the ground that the limited partners acted as general partners.

### B.

The parties are in agreement that the Debtor, operating as a Massachusetts limited partnership in the years 1984 through 1988, was subject to the Massachusetts Limited Partnership Act, MASS.GEN.L. ch. 109, as revised in 1982. ("1982 MLPA"). Section 19(a) of the MLPA during the relevant time period provided:

> ... a limited partner is not liable for the obligations of a limited partnership unless he is also a general partner or, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business; provided, however,

that if the limited partner's participation in the control of the business is not substantially the same as the exercise of the powers of a general partner, he is liable only to persons who transact business with the limited partnership with actual knowledge of his participation in control.

MASS.GEN.L. ch. 109, § 19(a) (1982).[3]

■ The 1982 MLPA included § 19(b)(2), which provided, in relevant part, that "[a] limited partner shall not participate in the control of the business ... solely by ... consulting with and advising a general partner with respect to the business of the limited partnership." MASS.GEN.L. ch. 109, § 19(b)(2) (1982). Under § 19(a), a limited partner may be liable as a general partner for partnership debts if: (1) the limited partner's participation in control of the business is substantially the same as the exercise of the powers of a general partner or (2) the limited partner takes part in control of the business and creditors have actual knowledge of the limited partner's participation and control. *See Gateway Potato Sales v. G.B. Inv. Co.,* 170 Ariz. 137, 822 P.2d 490 (App.1991) (construing Arizona statute similar to 1982 MLPA). Because the Trustee makes no claim that any creditors had knowledge of Astroline Company's alleged participation in control of the Debtor, the issue for the court is whether Astroline Company's "participation in the control of the [Debtor was] substantially the same as the exercise of the powers of a general partner."

### C.

■ To establish the exercise of the powers of a general partner by Astroline Company, the Trustee asserts that the "power of Astroline Company ... over the Debtor's bank accounts is sufficient, in and of itself. . . ." Plaintiff's Proposed Findings of Fact and Conclusions of Law at 33. The Trustee contends that "[a]lthough the Defendants offered evidence at trial that Ramirez and the [Debtor's] staff made the day-to-day

---

**3.** Under current Massachusetts law, (not applicable in this proceeding) a limited partner is liable as a general partner if "he participates in the control of the business ... [but] he is liable only to persons who transact business with the limited

partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner." MASS.GEN LAWS ANN. ch. 109, § 19(a) (West 1995).

decisions regarding the operation of the television station, [he] correspondingly demonstrated that true control of the business, through control of the dollars, rested with Astroline Company." Trustee's Response to Defendants' Post–Trial Memoranda at 9. On the issue of the type of activity by a limited partner sufficient to make it liable as a general partner, the Trustee cites 4 ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP § 15.14(d) at 15.128 (1994) for the proposition: "Control over bank accounts is important not only because of the inherent importance of money in most businesses, but also because it is easier to document." Plaintiff's Proposed Findings of Fact and Conclusions of Law at 31.

The Trustee places much reliance on *Holzman v. DeEscamilla*, 86 Cal.App.2d 858, 195 P.2d 833 (1948) for its holding that limited partners' absolute power to withdraw all of the partnership funds without the knowledge or consent of the general partner constitutes taking control of the partnership such that limited partners become liable as general partners to the bankruptcy trustee of the limited partnership. *Holzman*, construing a statute which read: "A limited partner shall not become liable as a general partner, unless ... he takes part in the control of the business," concerned a limited partnership engaged in the business of raising vegetables for market. *Id.*, 195 P.2d at 834. The partnership consisted of one general partner and two limited partners. The evidence showed: (1) the three partners always conferred on what crops to plant and that sometimes the limited partners dictated the choice of crops over the dissent of the general partner; (2) the partnership maintained two bank accounts upon which checks could be drawn only with the signatures of two partners, so that the general partner could only draw checks with the signature of a limited partner, but the limited partners could draw checks without the signature of the general partner; and (3) the limited partners requested that the general partner resign as the manager of the partnership business, and they appointed a new manager. *Id.* In concluding the limited partners took part in the control of the business, the *Holzman* court

stated: "[t]he manner of withdrawing money from the bank accounts is particularly illuminating. The two men had absolute power to withdraw all the partnership funds in the banks without the knowledge or consent of the general partner." *Id.*

The Trustee emphasizes Astroline Company's exclusive possession of the Debtor's checkbook at its offices in Massachusetts, the writing of the two checks in 1985 for "interest" without Ramirez's knowledge, and the power of the partners of Astroline Company to empty the Debtor's bank account at any time without Ramirez's knowledge, consent or participation as evidence of Astroline Company (and its general partners) exercising the powers of a general partner. The Trustee further states it is a fair inference that Boling was controlling payment of invoices by initialing the invoices with his "O.K."

The defendants contend the Cash Management System, when viewed within the entire context of the Debtor's operations, does not amount to Astroline Company exercising the powers of a general partner. Ramirez, Planell and Rozanski, as well as Boling and Richard Gibbs, all testified that Astroline Company (and its general partners) made no decisions concerning the business operations of the Debtor. Planell and Ramirez decided on programming strategy for Channel 18. The Astroline Company partners had no experience in operating a television station, and Ramirez decided who and how many to employ, what goods and services to purchase, and when or what invoices to pay.

Boling testified that his notations of "O.K." on certain invoices were the recording of Ramirez's directions, not Boling's, as to priority of payment. The defendants also contend the maintenance of the checkbook and the Debtor's bank account in Massachusetts was more the result of the neverending need to have Astroline Company fund the Debtor's continuous losses. Certain of the defendants cite *First Wisconsin National Bank of Milwaukee v. Towboat Partners, Ltd.*, 630 F.Supp. 171 (E.D.Mo.1986), where limited partners guaranteed a line of credit for the limited partnership, and the guaranty provid-

ed that any draw under the line of credit had to be approved by the limited partners. In holding that the limited partners did not act as general partners in refusing to approve draws under the line of credit, the court found that the limited partners were doing nothing more than exercising control over what was, in effect, the expenditure of their own funds. *Id.* at 174–175.

### D.

Section 19(a) of the 1982 MLPA is based upon § 303 of the 1976 Revised Uniform Limited Partnership Act (the "1976 RULPA"). The drafters of the 1976 RULPA made the following comment about the changes to the prior Uniform Limited Partnership Act:

> Section 303 makes several important changes in Section 7 of the prior uniform law. The first sentence of Section 303(a) carries over the basic test from former Section 7 whether the limited partner "takes part in the control of the business" in order to insure that judicial decisions under the prior uniform law remain applicable to the extent not expressly changed. The second sentence of Section 303(a) reflects a wholly new concept. Because of the difficulty of determining when the "control" line has been overstepped, it was thought it unfair to impose general partner's liability on a limited partner except to the extent that a third party had knowledge of his participation in control of the business. On the other hand, in order to avoid permitting a limited partner to exercise *all* of the powers of a general partner while avoiding any direct dealings with third parties, the "is not substantially the same as" test was introduced....

1976 RULPA § 303 (comment). (Emphasis added).

This language seems to indicate an intent to hold limited partners liable as general partners, in the nonreliance situations, where the limited partners exercise "all" of the powers of a general partner. *Cf. Hommel v. Micco,* 76 Ohio App.3d 690, 602 N.E.2d 1259, 1262 (1991) ("rights of a limited partner are similar to those of a stockholder in a corporation," and will be held liable as general part

ner when they exercise "total control over the limited partnership"); *Mount Vernon Sav. & Loan Ass'n v. Partridge Associates,* 679 F.Supp. 522, 528 (D.Md.1987) ("question is not whether [limited partner] provided advice and counsel to [limited partnership] . . . but whether it exercised at least an equal voice in making partnership decisions so as, in effect, to be a general partner").

There is a critical distinction between the *actual* exercise of control and the *potential* to exercise control. Section 19(a) of the 1982 MLPA requires that the limited partner *take part* in the control of the business substantially the same as the exercise of the powers of a general partner in order to be held liable as a general partner. According to BROMBERG AND RIBSTEIN ON PARTNERSHIP § 15.14(d) at 15.128 (1994), "[t]he statutory language [of the prior uniform act] contemplates actual (exercised) control rather than a mere right to control." *Id.* These authors distinguish *Holzman, supra,* in which the court emphasized the right to control through the bank accounts, as follows: "There was, however, ample evidence of actual control through the dictation of crops and forcing the general partner's resignation. Thus, the discussion of right to control may be regarded as dictum." *Id.* n. 47. Furthermore, *Holzman* was a case interpreting the prior uniform limited partnership act and the substantially the same as test in the 1976 RULPA requires somewhat more control than under the prior act. BROMBERG AND RIBSTEIN ON PARTNERSHIP § 15.14(f) at 15:134 (1994).

### E.

The court concludes that Astroline Company's activities in connection with the Debtor do not meet the standard of substantially the same as the exercise of the powers of a general partner. Despite the intense level of investigation undertaken by the Trustee of the Debtor's prepetition history, the court would have to engage in conjecture and surmise to find any control of the Debtor's day-to-day operation of the Channel 18 television station. The court credits the testimony of Ramirez, supported by that of Planell and Rozanski, that he, as the managing general

partner, exercised fully his powers as such, and that Astroline Company had no equal voice in his decisions.

The Cash Management System, with Astroline Company in control of the Debtor's checkbook and the sweeping of all of the Debtor's income to the out-of-state bank, certainly justifies the Trustee's questioning the status of Astroline Company as simply a limited partner of the Debtor. The court, however, cannot find as a fact that Astroline Company ever did anything more than prepare the checks as directed by Ramirez or Rozanski and add to the Debtor's bank account those funds necessary to make good the issued checks. Funding in this manner reduced the borrowing costs of Astroline Company. While Astroline Company had the power to empty the Debtor's bank account, it never did so; neither did it refuse to prepare checks in order to override any decision of Ramirez. Ramirez testified that until the funding by Astroline Company ceased, every invoice was paid that he wanted paid. All of the relatively few checks which were signed by the Astroline Company partners, except for two, were adequately explained as either being payable to Ramirez himself, necessarily signed due to Ramirez's absence, or for other reasonable considerations.

The two checks, drawn in 1985 payable to Astroline Company for interest, without Ramirez's knowledge, do defy an explanation. However, these two instances occurred relatively shortly after the television station started operating, and did not recur during the following several years of the Debtor's operation. The court need not decide whether a limited partner must exercise "all" the powers of general partners to be liable as a general partner, in order to conclude that the actions of Astroline Company, proven at trial, do not constitute participation in control of the business substantially the same as the exercise of the powers of a general partner. Additional defenses personal only to the defendant, Randall L. Gibbs, and to the defendants, Carolyn H. Gibbs, Richard Goldstein, Edward A. Saxe and Alan Tobin, as Co-Executors of the Estate of Joel A. Gibbs, which have been advanced need not be, and have not been, considered.

## IV.

### CONCLUSION

Finding that the defendants' exercise of control over the Debtor does not meet the requisite standard of substantially the same as the exercise of the powers of a general partner, the court concludes that Astroline Company (and its general partners) are not liable as a general partner of the Debtor to satisfy the deficiency in the estate's property to pay claims of creditors. An order will issue that this action be dismissed on the merits as to the defendants, Astroline Company; Astroline Company, Inc.; Herbert A. Sostek; Fred J. Boling, Jr.; Richard H. Gibbs; Randall L. Gibbs; Carolyn H. Gibbs, Richard Goldstein, Edward A. Saxe and Alan Tobin, as Co-Executors of the Estate of Joel A. Gibbs. Each party shall bear its own costs and attorney's fees.

### JUDGMENT

This action having come on for trial before the court, Honorable Robert L. Krechevsky, Chief Bankruptcy Judge, presiding, and the issues having been tried and the court having issued a memorandum of decision, in conformity with such memorandum of decision, it is

ORDERED, ADJUDGED AND DECREED that this action be dismissed on the merits as to the defendants, Astroline Company; Astroline Company, Inc.; Herbert A. Sostek; Fred J. Boling, Jr.; Richard H. Gibbs; Randall L. Gibbs; Carolyn H. Gibbs, Richard Goldstein, Edward A. Saxe and Alan Tobin, as Co-Executors of the Estate of Joel A. Gibbs. Each party shall bear its own costs and attorney's fees.